UNITED STATES OF AMERICA
 WESTERN DISTRICT OF NEW YORK                21-CR-06105 (EAW)


UNITED STATES OF AMERICA                     SENTENCING
                                             STATEMENTAND
                                             REQUEST FOR A
              v.                             NON GUIDELINE
                                             SENTENCE

JOSHUA SATTORA

_____

SONYA A. ZOGHLIN, Assistant Federal Public Defender for the Western District of New

York affirms as follows:

I am licensed to practice law in the State of New York and the United States District Court

for the Western District of New York, and I represent the defendant, Joshua Sattora.

The factual representations made in this Statement are based on investigations by members

of my office, including a forensic computer review of the evidence recovered from the electronic

devices seized in this case; conversations with Joshua Sattora, his family members and others; and

a review of the Presentence Investigation Report (Dkt. #78 "PSR") and the following exhibits:

Exhibit A:    Letter from Joshua Sattora

Exhibit B:    Letter from Joshua's mother, Eileen Wilmot

Exhibit C:    Letter from Joshua's grandmother, Ethel Sattora

Exhibit D:    Family photographs

              1.  Joshua and his mother, Eileen Wilmot
              2.  Joshua with his grandparents, Ethel & John Sattora
              3.  Joshua with his siblings

## PROCEDURAL HISTORY

On July 28, 2021, Joshua Sattora pleaded guilty to a single-count Information charging

him with receipt of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and

1

2252A(b)(1). The plea agreement (dkt. #73) reflects an agreed-upon recommended sentencing guideline range of **97 to 121 months.** *Id.* at ¶14. The probation department has calculated a sentencing guideline range of **151-188 months**. PSR at ¶107. The government has maintained its commitment to the original, agreed upon range, as they must. *See* Dkt. #79 at p. 1.

Mr. Sattora has reserved the right, however, to argue for a below-guideline sentence. He respectfully submits that a below guideline sentence is clearly appropriate under the circumstances of this case and urges this Court to impose the mandatory minimum period of incarceration (5 years), to be followed by a significant period of supervised release. This sentence serves the purposes set forth under 18 U.S.C. §3553(a) and would be "sufficient, but not greater than necessary" to meet federal sentencing goals.

Mr. Sattora also requests that the recommend to the Bureau of Prisons that he be housed in a facility as close to Rochester, New York as possible and at a facility with a S.O.M.P. (Sex Offender Management Program). Finally, the Court should conclude that he is indigent based upon the information contained in the PSR and not impose any financial penalties. *See* PSR ¶¶ 127-129.

**GENERAL SENTENCING AUTHORITY**

Under 18 USC §3553(a), federal sentencing courts must impose a sentence that is *sufficient, but not greater than necessary*, to meet the purposes of sentencing. In other words, if the district court concludes that either of two sentences would properly serve the statutory purposes of §3553(a), application of the parsimony clause compels imposition of the lesser sentence. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

These four purposes of sentencing are:

- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

- to afford adequate deterrence to criminal conduct;

- to protect the public from further crimes of the defendant; and

- to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*See* 18 U.S.C. §3553(a)(2)(A-D).

The sentencing court must consider the advisory Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220, 245-246 (2005). The Second Circuit Court of Appeals has made clear, however, that the guidelines are *not* presumptively reasonable. *See United States v. Friedberg*, 558 F.3d 131, 137 (2d Cir. 2009); *see also United States v. Eberhard*, 525 F.3d 175, 179 (2d Cir. 2008) ("we do not presume that a Guidelines sentence is reasonable"). Accordingly, after correctly calculating the advisory guidelines range, a sentencing court must conduct its own independent review of the §3553(a) sentencing factors. *See United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010) (citing *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008), *cert. denied* 129 S. Ct. 2735 (2009)) ("Even where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors").

When applying § 3553(a) and its parsimony clause, a sentencing court must look to the nature and circumstances of the offense, the history and characteristics of the defendant, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct and the Guidelines themselves. *United States v. Dorvee*, 616 F.3d at 183. The importance of individualized sentencing is a central theme in federal criminal law:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, and sometimes magnify, the crime and the punishment to ensue.

*Koon v. United States*, 518 U.S. 81, 113 (1996).

In *Kimbrough v. United States*, the Supreme Court reminded the district courts that:

> The sentencing judge . . . has greater familiarity with ... the individual case and the individual defendant before him than the Commission or the appeals court. . . . He is therefore in a superior position to find facts and judge their import under § [3553(a)] in each particular case.

552 U.S. 85, 108 (2007) (internal quotations omitted).

In addition to considering the unique circumstances of this case, the Court should also consider the fact that the sentencing guidelines applicable to child pornography cases are uniquely harsh and disproportionate as compared to other serious crimes.

Under the circumstances of this case and Joshua Sattora's history, the application of the guidelines as calculated in the plea agreement, and even more so those contained in the PSR, lead to a proposed sentence entirely inconsistent with the statutory requirements set forth in 18 USC §3553. The Court must consider, but should reject the guideline calculation in this case.

**GROUNDS FOR IMPOSITION OF A NON-GUIDELINE SENTENCE IN THIS CASE**

***U.S.S.G. § 2G2.2 is fundamentally different from other guidelines and must be applied with great care***

Congress delegated to the Sentencing Commission the discretion and authority to initially formulate the guidelines because "[d]eveloping proportionate penalties for hundreds of different crimes by a virtually limitless array of offenders is precisely the sort of intricate, labor-intensive task for which delegation to an expert body is especially appropriate." *Mistretta v. United States*, 488 U.S. 361, 367, 379 (1989). One of the benefits of the Commission was that it provided "some insulation from the distorting pressures of politics" and was in position to monitor, study, and revise the guidelines over time." Frank O. Bowman, III, *The Failure of the Federal Sentencing*

*Guidelines: A Structural Analysis*, 105 Colum. L.Rev. 1315, 1324 (2005).

In several areas of the guidelines, including those applicable to sex offenses, Congress has stepped in to direct the Commission's work by its use of increases in mandatory minimum sentences and directives to the Commission that were designed to change sentencing policy. U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing:  An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 72–73 (November 2004) ["Fifteen Year Report"].[1] The Commission itself recognized that "[m]uch like policymaking in the area of drug trafficking, Congress has used a mix of mandatory minimum penalty increases and directives to the Commission to change sentencing policy for sex offenses." *Id*. Regarding the child pornography guidelines, "[t]he principal or only reason given by the Commission itself for each of the amendments is that the amendment was undertaken exclusively or primarily at the behest of Congress." *United States v. Beiermann*, 599 F.Supp.2d 1087, 1100 (N.D.Iowa 2009); *see also* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (Jan. 1, 2009).

District courts are empowered to categorically disagree with the guidelines where they "'do not exemplify the Commission's exercise of its characteristic institutional role.'" *Spears v. United States*, 555 U.S. 261, 264, (2009) (per curiam) (quoting *Kimbrough v. United States*, 552 U.S. 85, 109 (2007)). The Second Circuit Court of Appeals, in *United States v. Dorvee*, 616 F.3d at 174, a child pornography distribution case, recognized the struggle sentencing judges encounter when considering the Guidelines range in child pornography cases. The *Dorvee* panel acknowledged that the § 2G2.2 guideline is fundamentally different from most and that, unless applied with great care, could lead to unreasonable sentences inconsistent with the requirements

---

[1]Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf (accessed 11/10/21).

of 18 U.S.C. § 3553. *Id*. at 184. The *Dorvee* panel noted that the § 2G2.2 guidelines are not based upon empirical data derived from past sentencing practices. Instead, the Guideline was amended several times at Congress' direction recommending harsher penalties. *See Dorvee*, 616 F.3d at 184 – 185.

In addition to considering the unique circumstances of this case, particularly Joshua Sattora's background and lack of any significant prior criminal record, the Court should also consider the fact that certain "specific offense characteristics" within the sentencing guidelines are so ubiquitous as to have lost all meaning. *See United States v. Jenkins*, 854 F.3d 181, 188-189 (2d Cir. 2017) (noting that certain enhancements applied to the guideline calculations, including "use of a computer," are "all-but-inherent" in the commission of the offense.")

The Court in *Jenkins* highlighted four of these "all-but-inherent" Specific Offense Characteristics: U.S.S.G.§§ 2G2.2 (b)(2), (b)(4), (b)(6), & (b)(7). As the Court noted, in 2014 Guideline §2G2.2(b)(2) (2 level enhancement for prepubescent minor/victim under 12) was applied in 95.9% of cases; §2G2.2(b)(4) (4 level enhancement for S/M or sexual abuse of infant or toddler) was applied in 84.5% of the cases; §2G2.2(b)(6) (2 levels for use of a computer) was applied in 95% of cases; and §2G2.2(b)(7) (**5 level** enhancement for 600 or more images) was applied in 79.3% of cases. *Id. Each of these specific offense characteristics was applied in this case.* As a result, the original base level offense of 22 was elevated by *13 levels* solely by virtue of the specific offense characteristics highlighted by the Second Circuit in *Jenkins*.

### RATES OF RECIDIVISM AMONG FEDERAL OFFENDERS

In March 2016, the United States Sentencing Commission (USSC) published the results of its multi-year study analyzing the recidivism rates of more than 25,000 federal offenders. *See Recidivism of Federal Offenders: A Comprehensive Overview,* available at

https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview, accessed 11/10/21. Among the key findings of the report are the following:

- A federal offender's criminal history category is closely related to his likelihood to reoffend, i.e., the lower the criminal history category, the lower the risk of recidivism with each additional criminal history point generally associated with a greater likelihood of recidivism;

- A federal offender's age at the time of release into the community was also closely associated with his likelihood of reoffending, with offenders released prior to age 21 having the highest re-arrest and the oldest offenders with the lowest;

- Other factors, including offense type and educational level, were associated with differing rates of recidivism but less so than age and criminal history;

- The severity of a federal offender's crime (as measured by the final offense level calculation) is *not* correlated with the rate of recidivism;

- The *type* of offense is correlated with the rate of recidivism, e.g., an individual convicted of a firearms related offense was much more likely to be re-arrested (68.3%) than an offender convicted of a fraud related offenses (34.2%).

Building on its 2016 report, the USSC published a report the next year focused specifically on the relationship between criminal history and recidivism. *See* The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders, available at https://www.ussc.gov/research/research-reports/criminal-history-and-recidivism-federal-offenders, accessed 11/10/21. This report confirmed the conclusions reached in the earlier report about the significant correlation between criminal history and recidivism. Specifically, the USSC reported the following:

- Recidivism rates are closely correlated with total criminal history points and resulting Criminal History Category classification –

offenders with lower criminal history scores have lower recidivism rates;

- There were substantial differences in recidivism rates *among* Criminal History Category 1 offenders (which include offenders with 0-1 criminal history points), i.e., those with zero points were significantly less likely to be rearrested than those with one point;

- Among those offenders with zero criminal history points, those with no prior contact with the criminal justice system have a lower recidivism rate than those who had some prior criminal justice contact.

This data establishes that criminal history and age at the time of release are consistently strong indicators of an offender's likelihood of recidivism. Joshua Sattora is 37 years old.  His criminal history score is zero, (despite a string of driving related offenses between the ages of 18 and 24), placing him firmly in Criminal History Category I. *See* PSR at ¶ 101. By statistics alone, in addition to his individual characteristics and history, the likelihood of Josh Sattora committing another crime after he is released (and then on closely monitored supervision) is extremely low.

## THE NATURE OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

### *The Investigation*

The conduct underlying the instant offense occurred between December 2017 and August 2018. During this time period, in July 2018, the New York State Police (NYSP) were advised that child pornography had been detected and linked to Joshua Sattora's email and an "IP address" at his home in Greece. With this information, the State Police sought and obtained a search warrant for his home. This search warrant was executed on September 21, 2018.

While the search was being conducted, NYSP Inv. David Cerretto interviewed Josh outside his home. Josh was entirely cooperative during this process, confirming that he used the IP address in question and providing the password to his phone and other devices. He also acknowledged that

he possessed child pornography. After the interview at his home, Josh voluntarily accompanied Inv. Ceretto to police headquarters and agreed to participate in a polygraph examination. During the polygraph, Josh admitted possessing child pornography and denied having any sexual contact with children. As noted on the NYSP incident report, the polygraphist, Sr. Inv. Thomas Crowley "concluded that Joshua Sattora had been TRUTHFUL and did PASS the polygraph examination" (*emphasis in original*). *See also* PSR at ¶ 30.

At this point, the police had possession of all of the devices containing the evidence underlying the instant offense. Josh's phone was not examined, however, until May 10, 2019, approximately eight months after it was seized. Upon examination, an investigator in the computer crime unit of the NYSP discovered the text messages and photographs exchanged between Josh and "Becca," whom police identified as Rebecca Woodin. In June, NYSP investigators decided to charge Josh with Possessing a Sexual Performance by a Child in violation of New York State Penal Law § 263.16. On July 16, 2019, approximately 10 months after the search, Josh agreed to accompany Inv. Frederick Sousa to NYSP headquarters for "processing" on the state charges. Inv. Sousa issued Josh an "appearance ticket" and drove him home.

From September 21, 2018, when Josh was present during the search of his home and interviewed by NYSP investigators until August 6, 2019, when he appeared in Greece Town Court, he was aware that police had seized his devices and that these devices contained evidence of the crime he had admitted to the police that he committed, possession of child pornography. From July 16, 2019, when he was issued the appearance ticket until January 27, 2020 when he was taken into custody at his home by federal agents, Josh was aware that criminal charges related to this evidence were pending against him. For the entire 16-month time period (from the search of his home until his arrest on federal charges), Josh cooperated with law enforcement, lived at the same address,

maintained the same employment, and did not engage in any unlawful conduct.

### The State Court Proceedings

As noted above, New York State Police searched Joshua Sattora's home and seized his electronic devices on September 21, 2018. He was also interviewed and agreed to a polygraph examination that day, during which he admitted that he possessed child pornography. Ten months later, he was issued an "appearance ticket" charging him with Possessing a Sexual Performance by a Child and directing him to appear in Greece Town Court on August 6, 2019. Josh attended court as directed and was released on his own recognizance. Between that date and November 6, 2019, the parties engaged in plea negotiations and the case remained pending.

On November 6, 2019, Josh appeared before Judge Stephen Miller in Monroe County Court, waived indictment, and pled guilty to a Superior Court Information charging him with Possessing a Sexual Performance by a Child. The parties agreed that, in exchange for his guilty plea, Josh would receive a sentence of *10-years of probation* (with sex offender conditions) and eight work weekends. He remained out of custody. Thereafter, Josh reported to the Monroe County Probation Department, as directed, to be interviewed for the Presentence Investigation Report. Noting both the number of images found on his electronic devices and the specific conversations between Sattora and Woodin that form the basis for the instant offense, *the probation department concurred with the agreement of the parties and recommended probation supervision* with specified conditions tailored to individuals convicted of sex offenses. The conviction was subsequently vacated before the sentence was imposed as a result of his arrest for this case. It will be dismissed when Josh is sentenced by this Court.

### The relative culpability of Joshua Sattora and his co-defendant, Rebecca Woodin

Between November 23, 2017 and September 20, 2018, Joshua Sattora and his co-defendant

and former girlfriend, Rebecca ("Becca") Woodin, exchanged *15,808 text messages*. Most of them had nothing to do with the minor victim in this case or child pornography generally. Many did. Those conversations between Sattora and Woodin are undeniably repugnant. That they show a mutual interest in sexual contact with children, whether in reality or fantasy, is also clear. What these messages do not show, however, is that Sattora induced or persuaded Woodin to take photographs of the minor victim (over whom she had custody and control) or to send them to him. *See* PSR at p. 17, n. 2 ("It should be noted that there is no forensic evidence to support Sattora having asked Woodin to send him the images.")

Despite Sattora's apparent and disturbing enthusiasm about receiving the pictures, during that entire period and over thousands of messages, it was Woodin who persisted in taking and sending the photographs. The following exchange, which occurred on August 13, 2018, illustrates this dynamic:

| REBECCA WOODIN: | I'm giving [MV1] a bath |
|---|---|
| JOSHUA SATTORA: | Cool |
| REBECCA WOODIN: | Can I be a brat |
| JOSHUA SATTORA: | I guess |
| REBECCA WOODIN: | You don't want me to I won't |
| JOSHUA SATTORA: | You can |
| REBECCA WOODIN: | [Woodin sends picture of MV1 to Sattora] |

*See* Amended Criminal Complaint, Dkt. #11 at p. 10.

Josh Sattora's position from the outset has been that he is not guilty of producing child pornography. For that reason, he declined the initial offer from the government, which included an agreement to apply the "production guidelines" set forth in U.S.S.G. §2G2.1. The government subsequently revised the offer and agreed that the applicable guideline was §2G2.2. Finding no evidence of production, the probation department came to the same conclusion and did not apply

the cross-reference contained in §2G2.2(c)(1) to his case. PSR at ¶74.

Clearly, Josh is guilty of violating 18 U.S.C. §2252(a)(2)(A) by receiving child pornography; he has accepted full responsibility for committing that crime. Ms. Woodin's assertion that he was in any way overbearing or pressured her to send him photos of her step-daughter, however, is belied by the extensive, documented communication between them. It is simply not true. Similarly, her claim to the psychiatrist who evaluated her that "[w]hen investigators questioned her about the photographs she'd sent, 'I told them the truth,'" is also a lie. *See United States v. Wooodin*, 21-CR-6030 (EAW), Dkt. #82-2. In fact, Woodin denied ever having any inappropriate, sexual contact with the child, even passing a polygraph test in which she persisted in that claim, despite photographic evidence to the contrary. At her detention hearing before Magistrate Judge Payson, the government characterized Woodin as "dangerously deceptive."

In sum, Rebecca Woodin's allegation that she produced these pictures at Joshua Sattora's behest is not credible. The conversations between the two of them reveal that she was unhappy and isolated in her marriage and that he was hoping to rekindle their romantic relationship. As shocking and inappropriate as many of their exchanges are, none reveal an abusive relationship between the two of them; the evidence does not suggest that she was any more vulnerable to being influenced by him than he was by her.

The most obvious difference between Sattora and Woodin is that the government has not accused Mr. Sattora of having any inappropriate physical contact with the minor victim in this case – in fact he had no contact with her at all – or any other child. In contrast, his co-defendant not only had sexual contact with the child for purposes of producing child pornography, but had been accused of similarly inappropriate contact in the past. That Sattora knew she was engaging in this

12

conduct and neither discouraged nor intervened to protect the child is a disgrace. It is not, however, the same as engaging in the conduct himself.

On October 29, 2021, this Court sentenced Rebecca Woodin to 15 years in prison to be followed by 10 years of supervised release. Observing that the sentencing guidelines (of 240 months) were "astronomical," the Court imposed a significantly below-guideline sentence. The Court also echoed the Second Circuit's admonition that courts must be extremely cautious in their application of the child pornography guidelines. The same reasoning applies to Joshua Sattora's case. He, too, deserves a sentence that is significantly below the applicable guidelines.

### *Joshua's Family Background*

Joshua John Sattora was born in Rochester, New York on February 28, 1984.  He was raised by his mother, Eileen Wilmot. She and Josh's father, Dennis McNaughton, divorced when he was an infant. Eileen and Josh lived with Eileen's parents, John and Ethel Sattora, in Greece, New York until he was 13 years old. *See* Exhibit D, family photographs.

Josh's relationship with his father has been virtually non-existent. After having no contact since leaving the family when Josh was an infant, Dennis filed a petition in Family Court requesting visitation when Josh was three. He was granted supervised visits with Josh every other Sunday. After two months and without explanation, Josh's father disappeared. Josh didn't hear from his father again until he was eleven. On Josh's eleventh birthday, his father sent him a card and included a picture of himself with his new wife and their three children. Before Josh received the card, neither he nor his mother even knew that Dennis McNaughton had remarried or fathered more children. Josh's grandmother recalls him throwing the card to the floor in anger. He didn't hear from his father again for three years. When Josh was 14, Dennis contacted Eileen and asked to see his son. Though Josh agreed to see his father, by that point he felt no connection to him.

Josh recalls an awkward meeting that lasted an hour. That was the last time he had any contact with his father.

In July 1999, when Josh was 15, his mother married Glen Wilmot. Eileen and Glen had two children, Emma and Alex. They are 16 and 18 years younger than Josh, respectively. Josh and Glen never established a positive connection. Eileen recalls that Glen "tolerated" Josh, but favored his biological children and resented the attention Josh received from his mother. Eileen and Glen divorced in 2011.

### *Joshua's Education and Employment History*

When Josh was in first grade he was diagnosed with attention deficit hyperactivity disorder (ADHD). He was prescribed Ritalin and then Adderall, which he took until he turned 18. School was difficult for Josh for several reasons. As a result of his ADHD, sitting still and focusing at school was a challenge. He was also a target for bullies and had only a few friends. Josh was short and thin with red hair and freckles; as a child, it was not a popular look. He was called names and taunted by his peers to the point of getting into physical fights, which he inevitably lost. Josh's grandmother, Ethel, recalls a nice, young girl from the neighborhood, a high school senior, who took it upon herself to walk Josh from their bus stop to his grandmother's house to make sure he got there safely.

Josh attended Greece Central Schools for kindergarten through 8th grade, then Hilton High School for 9th and 10th grade. He had trouble keeping up with his peers and his grades were poor. After failing 10th grade once, Josh continued to struggle the next year, ultimately dropping out before he completed his sophomore year. He didn't give up on education, however, and successfully obtained his GED on December 5, 2001 when he was 17 years old.

After Josh left high school, he attended "BOCES 2 WEMOCO," a career and technical

learning facility in Spencerport that offers high school students "an opportunity to explore a number of different and technical fields while preparing for meaningful employment and post-secondary education." Josh chose to major in carpentry at WEMECO and graduated from the program with honors in 2002.

Josh has always had a strong work ethic. His mother was proud to explain that Josh has been steadily employed since he was a young teenager. One of his first jobs was picking apples at Kelly's Farm Market in Hilton. During the Christmas holiday season he also worked at Van Putte Gardens in Greece helping customers load Christmas trees onto their vehicles. When he was 17, Josh began working with his uncle, David Sattora, who owns Sattora Siding. Josh's strongest skill is building and installing countertops. Between 2003 and 2008, he was employed by Empire Fabricators, Inc., Rochester Countertops, and Kitchen Concepts. In 2008 Joshua returned to work with his uncle at Sattora Siding where he was gainfully employed for the next 12 years until his arrest and incarceration on this case in January 2020.

### *Joshua's Conduct Before and Since his Arrest*

As discussed above, Josh first became aware of this investigation when his home was searched by the New York State Police on September 21, 2018. He cooperated with law enforcement in every respect during the search and after, even agreeing to a polygraph examination. Josh remained out of custody for the next 16 months, living in the same home and working at the same job. Following his arrest, Josh continued to be cooperative and compliant, ultimately accepting responsibility for his conduct before this Court. He has been a model inmate at the Monroe County Jail and he has maintained contact with his family through daily phone and video calls. No doubt this pattern will continue at the BOP and beyond.

### *The Plight of Sex Offenders in the BOP*

To protect themselves from assault in prison, imprisoned sex offenders can request to be housed in solitary confinement. Although this solution addresses personal safety concerns within prison, the resulting isolation can be psychologically harmful. Long term solitary confinement is associated with "the decrease in the size of the hippocampus, the brain region related to learning, memory, and spatial awareness. . . a decrease in the formation of new neurons, and the eventual failure in hippocampal function. On the other hand, the amygdala increases its activity in response to isolation. This area mediates fear and anxiety, symptoms enhanced in prisoners in solitary confinement." *See,* Elena Blanco-Suarez, Ph.D., The Effects of Solitary Confinement on the Brain, *Psychology Today*, 2/27/2019, available at https://www.psychologytoday.com/us/blog/brain-chemistry/201902/the-effects-solitary-confinement-the-brain, accessed 11/11/21. Unfortunately for inmates like Josh, the BOP is simply not capable of providing safe, supportive, housing and treatment on any long-term basis. The less time he spends there, the sooner Josh can get the consistent psychological counseling and support that he needs.

### *The Collateral Consequences of Joshua's Conviction*

As a result of having a federal felony conviction, Josh will be permanently deprived of many rights the rest of us take for granted. *See* Harold Baer, Jr., "Collateral Consequences of Conviction: A Reminder of Some Possible Civil Penalties," (Rev. Nov. 1, 2011), available at https://nysba.org/app/uploads/2020/02/BaerCollateralConsequences-WEB.pdf,                accessed 11/11/21.  While he is incarcerated and subsequently under supervision, he will lose his right to vote; he will be disqualified from serving on a jury; and he will be prohibited from possessing a firearm. Josh will face significant challenges regaining employment. While it is illegal in New York State to deny someone a job based solely on a felony conviction, that obstacle is not a difficult

16

one for employers to overcome.

Those consequences, however, pale in comparison to the severity and permanence of the consequences associated with being a convicted sex offender. Josh will be required to register with the Division of Criminal Justice Services (DCJS), the agency responsible for maintaining New York State's Sex Offender Registry. Following his sentencing in Federal Court and release from federal prison, a New York State Judge will review Josh's background and the circumstances of his conviction to determine his sex offender risk level pursuant to the Sex Offender Registry Act (SORA). Josh will have to notify DCJS each time he changes his residence and if he enrolls in or is employed by a school. Josh will also have to notify DCJS of his internet service provider, his screen name, and all e-mail accounts. If Josh moves out of New York, he will have to register as a sex offender in the state in which he resides and comply with that state's regulations. If he is designated a Level II or III sex offender, Josh will be required to register as a sex offender for the rest of his life.

Information about Josh's offense will be available to the public by phone and on the internet. Local law enforcement agencies can, and in some cases must, release the same information to entities with vulnerable populations, such as day care centers, or schools, even if an individual has been designated as a Level I offender. Depending on the assessed risk level, the information may also be shared with his neighbors and other members of the community. Because of these and other collateral consequences, convicted sex offenders struggle to find and maintain employment; preserve relationships with spouses, family and friends; and obtain suitable housing. *See,* Richard Tewksbury, Ph.D., et. al., *Final Report on Sex Offenders: Recidivism and Collateral Consequences*, prepared for the National Institute of Justice (September 30, 2011), available at https://www.ojp.gov/pdffiles1/nij/grants/238060.pdf, accessed 11/11/21. Sex offenders are

frequently targets for harassment and universally condemned.

From the outset, Josh has accepted full responsibility for his actions. As a result of those actions, he will forever be labeled a convicted felon and, much worse, a convicted sex offender. The collateral consequences of a felony conviction and sex offender registration will have a severe and permanent impact on Josh's life and livelihood. The stigma of his conviction, along with its potential impact on his personal and professional life, are relevant consequences for this Court to consider in determining a fair sentence in this case. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence.")

### *Letters of Acceptance and Support*

Josh has expressed his remorse and acceptance of responsibility in a letter to the Court. *See* Exhibit A. In it he explains that he's had a very long time to think about his offense since his arrest 22 months ago. He wants the Court to know that he understands and accepts the consequences of his actions, but also that he has plans for the future and looks forward to using and improving his skills to again become gainfully employed. He, like all of us, is much more than the worst thing he has done; he is much more and better than the messages he and Becca Woodin exchanged that are described in the PSR. Josh hasn't denied responsibility for this offense since the moment he was first questioned by law enforcement in September 2018. While he originally expected to be sentenced to probation in state court for the same crime, he understands that the consequences in federal court are much more severe and he is prepared to serve his time as productively as possible. Though he is understandably concerned about his welfare in the prison system, there is no question that neither the other inmates nor the staff will have any trouble from him.

Josh's mother, Eileen Wilmot has always been his strongest advocate and sometimes only

true friend. She clearly understands the nature of his crime and its consequences. She was shocked and horrified as she sat through a detention hearing listening to the messages he and Becca exchanged. She also loves and supports him and will continue to do so during his incarceration and beyond. Significantly, she recognizes that mental health counseling will be an important part of his recovery and rehabilitation. *See* Exhibit B.

Ethel Sattora, Josh's grandmother, also wanted the Court to know that she loves and supports him – at Josh's insistence, she has agreed not to attend his sentencing hearing. She describes her grandson as "a willing, efficient and dependable person to complete any task that was asked of him." *See* Exhibit C. Mrs. Sattora also has hope for his future. As she writes, "In closing I must say that Joshua has always given me reason to be so proud of him and I am assured that with time, the right help he so desperately needs and prayers, that it will be true again." *Id.*

## CONCLUSION

For all of these reasons, Joshua Sattora respectfully requests that this Court consider his work history, his family relationships, and the remorse and acceptance of responsibility he has sincerely expressed, and impose the mandatory minimum sentence of five years to be followed by a significant period of supervised release, a sentence that is both sufficient and not greater than necessary to serve the purposes of sentencing under 18 U.S.C. §3553(a).

Dated:   November 24, 2021

To:    Meghan K. McGuire, AUSA                    /s/ *Sonya A. Zoghlin, Esq.*
       Jessica L. Rider, USPO                      Assistant Federal Public Defender
                                                    Federal Public Defender's Office
                                                    28 East Main Street, Suite 400
                                                    Rochester, New York 14614
                                                    (585)262-6201
                                                    Sonya_Zoghlin@fd.org
                                                    Attorney for Joshua Sattora